03 027

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

JOHN VALVO

    VS                      C.A. NO. 04 70S

TRANS UNION, LLC

### MOTION TO EXCEED

      Now comes the plaintiff, John Valvo, and hereby moves for permission to exceed the 20 page limit for its exhibits and to file 37 pages of exhibits. Defendant, Trans Union, LLC, has no objection to this motion.

π OBJ z
Δ m/sq.



CHARLES N. REDIHAN, JR. (1810)
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI 02903
(401) 831-2900
(401) 331-7123 FAX

TO     Kevin C. Glavin, Esq.
         Cutcliffe, Glavin & Archetto
         155 South Main Street, Suite 300
         Providence, RI 02903

         Mark E. Kogan, Esq.
         Bruce S. Luckman, Esq.
         Timothy P. Creech, Esq.
         Saltzberg,Trichon,Kogan & Wertheimer,PC
         1818 Market St., 30th Floor
         Philadephia, PA 19103

GRANTED
William E. Smith
U.S. District Judge
7/26/05

### CERTIFICATION

      I hereby certify that I mailed a copy of the within to counsel of record, as above.

Dated: July 25, 2005

03 027

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF RHODE ISLAND

JOHN VALVO

     VS                                C. A. NO. 04 70S

TRANS UNION, LLC

**EXHIBITS**

|  | EXHIBIT |
|---|---|
| Little deposition p. 74 | 1 |
| Little deposition pp 69-70 | 2 |
| Little deposition pp 70-71 | 3 |
| Little deposition pp 73-74 | 4 |
| Little deposition p. 76 | 5 |
| John Valvo deposition p. 14 | 6 |
| Richard Lefebvre affidavit | 7 |
| John Valvo – Answer to Interrogatory No. 16 | 8 |
| John Valvo deposition p. 49-51 | 9 |
| John Valvo deposition p. 56 | 10 |
| John Valvo deposition p. 70 | 11 |
| John Valvo Affidavit | 12 |

# EXHIBIT 1

Eileen Little

1    -- I don't know why he missed it.  I can't

2    explain that.

3    Q.    Who was the operator on this?

4    A.    It was a Brian.

5    Q.    Cawthorne?

6    A.    Yes.

7    Q.    Is he still with Trans Union?

8    A.    No.

9    Q.    When did he leave?

10   A.    I believe it was October of '02.

11   Q.    And why did he leave, if you know?

12   A.    He was just a temporary associate.

13   Q.    Was he terminated --

14   A.    I don't believe that, no.

15   Q.    -- because of his performance?

16   A.    No.

17   Q.    He was a temporary hire and the time

18   was up?

19   A.    Yes.

20   Q.    You didn't need him any more,

21   something like that?

22   A.    Uh-huh.

23   Q.    Did Trans Union have any problem with

24   his performance while he was working there?

# EXHIBIT 2

Eileen Little

1    Q.        Thank you.

2    A.        Uh-huh.

3    Q.        13?

4    A.        A CDV on a public record set.

5    Q.        Okay.  This pertains to the

6  bankruptcy, does it not?

7    A.        Yes, it does.

8    Q.        Okay.  Do you have any way of telling

9  by looking at this whether this was generated

10  in-house?

11    A.        They're all generated in-house.

12    Q.        All generated in-house?

13    A.        Yes.

14    Q.        The public record vendors are just

15  supplying information on a continuous process?

16                MR. LUCKMAN:  Object to the

17  form.

18                MR. REDIHAN:  Okay.  I don't

19  blame you.

20  BY MR. REDIHAN:

21    Q.        When Trans Union is called upon to

22  verify the information in a consumer's public

23  records, does Trans Union do this in-house by

24  referring to its database?

Eileen Little

1    A.        No.  We generate the verification

2    form back to the vendor to have them go back

3    and research the information with the source of

4    the information the courthouse.

5    Q.        So you actually generate a form that

6    would go to the vendor.  In this case I believe

7    it's Hogan?

8    A.        Yes.

9    Q.        And then Hogan completes this form?

10    A.        Yes.

11    Q.        Okay.  Can you show me, if you would,

12    please, on what part is completed by Trans

13    Union before it's sent to Hogan?

14    A.        The left-hand side with all the

15    consumer's information.

16    Q.        Yes.

17    A.        The public record information --

18    Q.        Okay.

19    A.        -- as it was reported at the time of

20    the dispute.

21    Q.        Yes.

22    A.        And then, you know, what the consumer

23    is stating.

24    Q.        All right.  And Hogan or the vendor

**EXHIBIT 3**

Eileen Little

1    A.        No.  We generate the verification

2    form back to the vendor to have them go back

3    and research the information with the source of

4    the information the courthouse.

5    Q.        So you actually generate a form that

6    would go to the vendor.  In this case I believe

7    it's Hogan?

8    A.        Yes.

9    Q.        And then Hogan completes this form?

10   A.        Yes.

11   Q.        Okay.  Can you show me, if you would,

12   please, on what part is completed by Trans

13   Union before it's sent to Hogan?

14   A.        The left-hand side with all the

15   consumer's information.

16   Q.        Yes.

17   A.        The public record information --

18   Q.        Okay.

19   A.        -- as it was reported at the time of

20   the dispute.

21   Q.        Yes.

22   A.        And then, you know, what the consumer

23   is stating.

24   Q.        All right.  And Hogan or the vendor

Eileen Little

Page 71

1    would complete the right-hand upper side?

2    A.       Right-hand side. And then if they

3    were indicating any changes, they would fill in

4    the response codes.

5    Q.       Okay. And the response codes are at

6    the lower left?

7    A.       Right.

8    Q.       What is a response narrative? What's

9    that for?

10   A.       Where they're putting a free form

11   comment with instructions there.

12   Q.       Now, on this particular form it

13   appears Hogan is indicated on the left side  --

14   on the right side just the consumer's name and

15   Social Security number, am I correct?

16   A.       They're verifying a change, yes.

17   Q.       Okay. They're verifying that that is

18   the name and the Social Security number of the

19   person that filed bankruptcy?

20   A.       Yes.

21   Q.       And then what other information did

22   Hogan give you?

23   A.       They were telling us to the change

24   the type of bankruptcy. We were reporting it

# EXHIBIT 4

Eileen Little

1   verify whether or not, in fact, John Valvo was

2   the person who filed the bankruptcy?

3   A.        Yes.

4   Q.        And they haven't done that; is that

5   right?

6   A.        Well, they did do that, yes.

7   Q.        What do you mean they did do that?

8   A.        They did verify that they had a

9   different middle initial and a different Social

10  Security number.

11  Q.        But they're saying otherwise the way

12  that's being interpreted as otherwise it's the

13  same person or is it -- would it be interpreted

14  by Trans Union as they are two different

15  people?

16  A.        I believe it should have been

17  interpreted as there's two different people,

18  different Social Security number.

19  Q.        All right.  And that being the case

20  the bankruptcy should have been removed from

21  Mr. Valvo's credit report, correct?

22  A.        I would think so, yes.

23  Q.        Do you know why that wasn't done?

24  A.        I would have to say the operator just

Eileen Little

1    -- I don't know why he missed it.  I can't

2    explain that.

3    Q.       Who was the operator on this?

4    A.       It was a Brian.

5    Q.       Cawthorne?

6    A.       Yes.

7    Q.       Is he still with Trans Union?

8    A.       No.

9    Q.       When did he leave?

10   A.       I believe it was October of '02.

11   Q.       And why did he leave, if you know?

12   A.       He was just a temporary associate.

13   Q.       Was he terminated --

14   A.       I don't believe that, no.

15   Q.       -- because of his performance?

16   A.       No.

17   Q.       He was a temporary hire and the time

18   was up?

19   A.       Yes.

20   Q.       You didn't need him any more,

21   something like that?

22   A.       Uh-huh.

23   Q.       Did Trans Union have any problem with

24   his performance while he was working there?

# EXHIBIT 5

Eileen Little

Page 76

1    ask you the question, if I may.  Who would

2    supervise someone in Brian Cawthorne's

3    position?

4    A.        He had a team leader.  He had a

5    department manager and then I'm responsible for

6    the department manager.

7    Q.        And how would the team leaders

8    supervise his work?

9    A.        They do audits.  They do quality

10   control.  You know, they check a portion of his

11   work each month.  I mean, every piece is not

12   quality controlled, but they'll take his work

13   and do every 15, every 10 pieces just spot

14   check that way.

15   Q.        And how many people is this team

16   leader responsible for?

17   A.        15.

18   Q.        And what's the team leader's name at

19   the time?

20   A.        This was in '02.  I don't know

21   offhand who was there in '02.  I would have to

22   get you that.  I don't know.

23   Q.        Okay.  That information would be

24   available?

# EXHIBIT 6

11/16/2004                                                    John Valvo

---

Page 14

1   Q. And do you personally guarantee that mortgage?
2   A. I think so. I think both myself and Michael
3   do, but I can't swear to it.
4   Q. Then don't. That's okay. Prior to December --
5   prior to the expiration of this Fleet mortgage in
6   December '03, you had that mortgage for ten
7   years? V & M Holding had the mortgage --
8   A. It was a 10 year with a 20 year ami.
9   Q. Does V & M Holding have any other debts?
10  A. No.
11         MR. LUCKMAN: Now, I know that I got
12  some tax returns -- did I get tax returns from
13  V & M Holding, do you know?
14         MR. REDIHAN: I don't think so.
15         MR. LUCKMAN: I don't want to quiz you,
16  Charles, but do you know if I got anything about
17  the revenues for V & M Holding?
18         MR. REDIHAN: I don't think you have.
19  All I have is the regular tax returns.
20  Q. I hadn't marked this, but I'm going to ask you to
21  take a look at -- these are handwritten journals
22  that start January '02 and appear to end in April
23  of '04. Could you identify those for me, please?
24  A. Yes, I could. These are eBay records of the
25  sales we have done from January '02 until April

---

Page 15

1   '04.
2   Q. And who is we?
3   A. ML Roberts.
4   Q. They're not for V & M Holding Company?
5   A. No.
6   Q. Would there be similar records for V & M Holding
7   Company?
8   A. Not as of yet because we have not done any
9   business like this for V & M yet.
10  Q. You mean on eBay?
11  A. Right.
12  Q. Is it your intention to do that?
13  A. That was my intention.
14  Q. So at some point you hope to do it?
15  A. I hope to start January 1.
16  Q. 2005?
17  A. Yes.
18  Q. And other than what you might sell on eBay, how
19  has V & M Holding Company -- how has it sold
20  items?
21  A. To customers, jewelry customers.
22  Q. Are there records of that anywhere?
23  A. I'm sure there are. Probably not quite as
24  extensive as ML Roberts, because it wasn't -- the
25  records are not quite as extensive as ML Roberts

---

Page 16

1   because we didn't do a lot of business.
2   Q. How would you decide whether something should be
3   sold through V & M Holding Company as opposed to
4   ML Roberts?
5   A. Where the money was available at that time.
6   If there was money available in V & M Holding and
7   ML Roberts was a little short at that time, I
8   would use V & M Holding to buy and sell the
9   merchandise. That's basically -- most of the
10  time that would determine if V & M came into play
11  at that time, because I always kept some extra
12  money in V & M Holding.
13  Q. There would be records kept of when those
14  transactions occurred?
15  A. I'm pretty sure, yeah.
16  Q. But you can't tell me now how many dollars in
17  revenues each year for the past couple of years?
18  A. No, I cannot at this present period of time
19  without consulting some records.
20         MR. REDIHAN: Off the record for just
21  one second.
22         (OFF THE RECORD)
23  Q. To date, V & M Holding Company has not sold
24  anything on eBay?
25  A. No, sir.

---

Page 17

1   Q. And to the extent V & M Holding Company has
2   bought or sold items, it's generally been because
3   ML Roberts didn't have the then current ability
4   to finance transactions?
5   A. At a particular time, right.
6   Q. Is that somewhat random?
7   A. Yes, that's random.
8   Q. Could you say how many times a year or month it
9   would occur?
10  A. I would say no more than a couple of times a
11  year, if that many.
12  Q. A couple of times a year?
13  A. Yeah.
14  Q. Does ML Roberts have a storefront anywhere?
15  A. No.
16  Q. So how does it do business?
17  A. Well, basically we've been in business under
18  the two names since 1927. So we're pretty well
19  known.
20  Q. The two names are what?
21  A. Kittay & Blitz originally which became ML
22  Roberts later on in life. So we've been around
23  for many, many years. Anyone in the jewelry
24  business is aware of us. When they need
25  merchandise, they call us. If we have something

---

5 (Pages 14 to 17)

# EXHIBIT 7

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

JOHN VALVO

     VS                                     C. A. NO. 04 70S

TRANS UNION, LLC

### Affidavit of Richard Lefebvre

I, Richard F. LeFebvre, being duly sworn hereby make affidavit and say:

1. For the past thirteen (13) years I have been the president of AAA American Credit Bureau, Inc. ("AAA"), a credit reporting agency located in Flagstaff, Arizona,

2. I have worked in the credit reporting industry for approximately fifteen (15) years and have received training in the following areas: preparing and interpreting of consumer credit reports, reinvestigating consumer credit disputes, reviewing and analyzing credit applications and complying with industry standards for credit reporting.

3. My credit responsibilities have included preparing all types of consumer reports, handling all types of consumer disputes, analyzing low credit scores and low credit worthiness as well as supervising AAA's administrative operations.

4. I have become familiar with the practices and procedures of Trans Union, LLC through my work in the credit reporting industry, through my employment with a Trans Union affiliate in 1991 and 1992, owner of AAA, and service as a consultant and/ or expert witness in civil actions in which Trans Union has been a defendant from 2001 to the present.

5. In addition, I have also reviewed the interrogatory answers of both parties in the instant action, the deposition transcripts of plaintiff and Eileen Little, group manager of defendant's consumer relations center, plaintiff's credit card applications to Fleet Bank, denial letters which plaintiff received from Fleet Bank and Citizens Bank, plaintiff's credit reports in 2002 and 2003, snapshots of his credit history from 2002 and 2003 and correspondence from plaintiff to Trans Union.

6. I also interviewed the plaintiff by telephone on July 7, 2005.

7. Based upon my experience in the credit reporting industry, my interview with plaintiff, my review of the documents previously listed in paragraph 5 and the facts contained

herein, my opinion is that Trans Union's procedures for maintaining and reporting credit information were not reasonable and that Trans Union is therefore negligent.

8. There is no evidence that the temporary employee involved in reinvestigating the bankruptcy received any training for the position or quality control supervision. This is an important factor since the damage to the plaintiff was much more then the quality control costs to TransUnion. Having a temporary employee performing consumer reinvestigations should have sent off red flags in which every reinvestigation performed by this temp should have had some sort of quality control measure from experienced higher ups at TransUnion.

9. Trans Union was made aware that the bankruptcy listing was incorrect, but did not remove the false information from plaintiff's credit file.

10. Trans Union's reinvestigation policies and procedures provided no direct supervision of its operators but merely required that a team leader review every tenth ( 10th) or fifteenth (15th) reinvestigation response form selected at random and not pursuant to any formula or standard accepted in the industry; these procedures and policies were unreasonable and reckless and not designed to make available the most accurate credit information possible.

11. In the case of consumer disputes, inquiries are sent out by Trans Union to data furnishers/subscribers furnishing disputed information, the responses are received back by Trans Union but there is no evidence that a procedure exists to check one response against any other for consistency and accuracy and many times this conduct is negligent and unreasonable.

12. V. & M. Holding Company's application to Fleet Bank for a business credit card in August of 2002 was denied on the basis of the false and inaccurate listing of bankruptcy on plaintiff's personal credit report generated by Trans Union and not on the commercial credit report of V & M Holding company. (See attached Exhibit A) Many lenders across the country that I did business with require most small businesses to put forth a corporate officer who will personally guarantee the debt in case the business defaults. Many times these credit cards report on the personal guarantor's personal credit files even though the payments are not paid by the guarantor and paid by the business. This is the main reason why lenders access personal credit files for a business credit card. If the guarantor is not credit worthy based on the lenders personal standards then the application will be turned down just as in this case.

13. Plaintiff's application to Fleet Bank in October or November of 2002 for a personal line of credit was denied on the basis of a false and inaccurate listing of a bankruptcy on his personal credit report generated by Trans Union (See Exhibit B).

14. Plaintiff's decided to apply for a loan with a mortgage company at a higher rate of interest rather than a bank or credit union out of his concern that the inaccurate listing of

a bankruptcy on his credit report generated by Trans Union would cause him to be denied credit.

15. Trans Union's inclusion of false and inaccurate information in plaintiff's credit file, its failure to conduct a reasonable reinvestigation and its unreasonable and reckless policies caused the plaintiff either to be denied credit or forced to obtain credit at a higher rate of interest because said policies and procedures allowed false and inaccurate information to be entered into plaintiff's credit report.

16. It is my opinion, to a reasonable degree of certainty in my field that plaintiff was denied credit and suffered damages as a result of the negligence of Trans Union and that the policies and procedures of TransUnion were unreasonable and reckless.

17. Damages include loss of value from the sale of bonds, higher interest on the mortgage and loss of profits from Mr. Valvo's inability to establish an eBay jewelry sales business.


Richard F. Lefebyre


Subscribed and sworn to before me under penalty of perjury this

19th Day of July, 2005 at  Fallbrook  California.

_____

# Jurat

State of California
County of *San Diego* }

Subscribed and sworn to (or affirmed) before me on this *19th* day of
*July*, 20*05*, by *Richard F. Le Febvre* ————
—————————————————, personally known to me or
proved to me on the basis of satisfactory evidence to be the person(s)
who appeared before me.

_____
**Signature of Notary Public**

PAMELA S. R. ESKUE
Commission #1374289
Notary Public - California
San Diego County
My Commission Exp. OCT. 8, 2006

## OPTIONAL

Though the data below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent reattachment of its form.

CAPACITY CLAIMED BY SIGNER

- [x] INDIVIDUAL
- [x] CORPORATE OFFICER

_____
TITLE(S)

- [x] PARTNER(S)    [x] LIMITED
                    [x] GENERAL
- [ ] ATTORNEY-IN-FACT
- [x] TRUSTEE(S)
- [x] GUARDIAN/CONSERVATOR
- [ ] OTHER: _____

_____
_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____
_____

DESCRIPTION OF ATTACHED DOCUMENT

*Affidavit Valvo vs Trans Union*
TITLE OR TYPE OF DOCUMENT

*3*
NUMBER OF PAGES

*7-19-05*
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE



Fleet Bank
PO Box 1568
Horsham, PA 19044

August 31, 2002

Reference No: 27811899

Valvo John
V  M Holding Company
8 Industrial Lane
Johnston, RI  02919-3126

Dear Valvo John:

Thank you for your recent application for credit issued by Fleet National Bank.

We are sorry that we cannot extend the credit you requested at this time.  After careful review, your application was denied for the following reason(s):

- Bankruptcy

We based our decision, entirely or in part, on a credit report obtained from the following reporting agency or agencies:

Trans Union Consumer Relations
760 W. Sproul Road
P.O. Box 390
Springfield, PA  19064-0390
1-800-888-4213

This reporting agency played no part in this decision and cannot supply specific reasons for the decision.  Under the Fair Credit Reporting Act, you have a right to a copy of your credit report at no cost to you from the consumer reporting agency shown above within 60 days of receiving this letter.  You may also question that agency regarding the accuracy or completeness of your credit report.

We regret any inconvenience this may have caused you.

Sincerely,

*John Andrews*

John Andrews
Credit Department

THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, MARITAL STATUS, AGE (PROVIDED THE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT); BECAUSE OF ALL OR PART OF THE APPLICANT'S INCOME DERIVES FROM ANY PUBLIC ASSISTANCE PROGRAM; OR BECAUSE THE APPLICANT HAS IN GOOD FAITH EXERCISED ANY RIGHT UNDER THE CONSUMER CREDIT PROTECTION ACT.  THE FEDERAL AGENCY THAT ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS CREDITOR IS THE OFFICE OF THE COMPTROLLER OF THE CURRENCY, CUSTOMER ASSISTANCE UNIT, 1301 MCKINNEY AVENUE, SUITE 3710, HOUSTON, TEXAS 77010.

AL224252059 NT224252059 J2 SBD SS007                    CHR9609S 1 OF 1 020901 ABC200C 578

ABC200C(29oeoo91)

# Fleet

440401-03
11/26/02

Fleet National Bank
P.O. Box 1660 (CTBPF02B)
Hartford, CT. 06144-1660
1-800-269-3084

```
------------------------------
| Notice of Adverse Action   |
|        Taken and           |
|     Principal Reasons      |
------------------------------
```

JOHN VALVO                              Ref #: 994023011030470
93 LOOKOUT AVE
JOHNSTON, RI 02919-6531

We sincerely regret that we are not able to approve your recent FLEET HOME
EQUITY LOAN application. Our principal reason for adverse action concerning
your application is:

    BANKRUPTCY ON FILE

Our credit decision was based in whole or in part on information in a
report from the consumer reporting agency listed below. The agency
played no part in our decision and is unable to supply specific reasons
for our decision.

You have a right under the Fair Credit Reporting Act to obtain a copy
of your credit report from the agency below. The report will be free
if you request it within 60 days after you receive this notice. You
also have the right to dispute with the agency below the accuracy or
completeness of any information in your report.

    TRANS UNION CORP.
    760 WEST SPROUL ROAD
    P.O. BOX 390
    SPRINGFIELD, PA 19064-0390
    800-888-4213

The Federal Equal Credit Opportunity Act prohibits creditors from
discriminating against credit applicants on the basis of race, color,
religion, national origin, sex, marital status, age (provided that the
applicant has the capacity to enter into a binding contract); because all
or part of the applicant's income derives from any public assistance
program; or because the applicant has in good faith exercised any right
under the Consumer Credit Protection Act. The federal agency that
administers compliance with this law concerning this creditor is The Office
of the Comptroller of the Currency, Customer Assistance Unit, 1301 Mckinney
Avenue, Suite 3710, Houston, TX  77010.

ABC20

**EXHIBIT 8**

03 027 CNR:SH

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

JOHN VALVO

     VS                                    C. A. NO. 04 70S

TRANS UNION, LLC

## PLAINTIFF'S ANSWERS TO DEFENDANT'S INTERROGATORIES

1.    State your full name, any nicknames or other names (including aliases) which you have used and the periods during which each name was used, current address, Social Security Number(s), and previous addresses over the last ten (10) years, including the dates when you lived at or otherwise used each address.

    ANSWER: John Valvo, 93 Lookout Avenue, Johnston, Rhode Island 02919; ▇▇▇ ▇▇▇▇ former address 10 Kimberly Ann Drive, Greenville, Rhode Island 02818.

2.    Do you contend that Trans Union has, at any time, generated a Consumer Report or File Disclosure about you which contained information which you allege is/was false, misleading and/or inaccurate? If the answer to this question is anything other than an unqualified "no", identify each such item of information and Report or File (by date).

    ANSWER: Objection, the question calls for a legal conclusion. Without waiving the objection, yes. Trans Union produced three reports dated 09/11/02; 10/15/02 and 08/08/03 which contained false, misleading and inaccurate information.

    09/11/02 – My name is incorrect. My name is John Valvo, not John J. Valvo. I have never filed for Bankruptcy. I have never lived at 350 Greenville Avenue in Johnston, Rhode Island. This report inaccurately lists my creditors including:

| | |
|---|---|
| HSBC Mortgage | Capital 1 Bank |
| HHLD Bank | Fashion Bug |
| CFX | HB/Comp USA |
| Fleet National Bank | HDMGBA/CDTCR |

    The 10/15/02 contains some of the same information as does the 08/08/03 report. The Bankruptcy appears in each report.

3.    With respect to each item of information set forth in your answer to 2 above, set

all documents which refer to such discussions.

ANSWER: I have had discussions about this with my wife, representatives of Trans Union, whose names I do not recall, representatives of Fleet, Sovereign, Citizens, American Mortgage Company about the denial of my applications for credit and the erroneous information I n my credit reports. I do not recall the names of all of these representatives and the dates of the discussions.

15.    If you contend that you have required medical treatment of any kind as a result of any act or failure to act by Trans Union, state precisely the condition treated, identify the treating physician (including psychologists) and the nature of your symptoms along with any diagnosis made by any such treating physician or psychologist and state whether you had any history of such symptoms or diagnosis prior to any act or failure to act by Trans Union and identify all documents which refer to such treatments and/or diagnosis.

ANSWER: None at this time.

16.    State precisely the nature and amount of each special, financial, economic, or other such damage(s) you claim to have personally suffered, including any financial opportunities you claim to have missed, the manner by which such damage(s) was calculated, and identify all documents which refer to your answer to this interrogatory.

ANSWER: See answer to Interrogatories 11 and 12. In addition, because I was unable to refinance my home, I had to sell tax free bonds before maturity. I sold the bonds which were worth $150,000.00 at maturity for approximately $127,000.00. I also  incurred tax liability that in the approximate amount of $3,000.00 to $3,500.00. I have not yet computed all of the damages. This answer will be supplemented shortly.

17.    Identify every person you intend to call as a witness at trial, including expert witnesses, and identify every person known to you that has any knowledge about he facts and/or circumstances of the allegations made in your Complaint and identify all documents which refer to your response to this interrogatory.

ANSWER: Objection, privileged. Without waiving the objection,  no experts have yet been retained.  I expect that bank personnel representatives of defendant, including Joseph Florio of Fleet Bank.

18.    Identify all other lawsuits or other legal proceedings (civil or criminal) in which you have been a party, witness, or were otherwise involved, from 1992 to the present, including for each suit or legal proceeding the date, case number, the name of the Court, the style of the case, the subject matter of the case, your role in the suit or proceeding, the amount in controversy, the Court's holding, if any, and the amount of damages awarded or the terms of any settlement.

ANSWER:   Objection, irrelevant. Without waiving the objection, this is public

information equally available to both parties.

19.    State with particularity each and every fact which you contend supports your claim for punitive damages, and for each fact, identify each and every person with knowledge of such fact and identify each and every document which evidences, constitutes, or refers to such fact.

ANSWER:    Objection, calls for a legal conclusion.    Plaintiff will rely on information obtained through discovery.  This answer will be supplemented.

_John Valvo_

John Valvo

Subscribed and sworn to before me under penalty of perjury  this  _23_  day of_____August_____, 2004.

_Charles N Redihan_

As to Objections:

_Charles N Redihan_

CHARLES N. REDIHAN, JR. (1810)
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI  02903
(401) 831-2900
(401) 331-7123 FAX

TO    Kevin C. Glavin, Esq.
      Cutcliffe, Glavin & Archetto
      155 South Main Street, Suite 300
      Providence, RI  02903

      Mark E. Kogan, Esq.
      Bruce S. Luckman, Esq.
      Timothy P. Creech, Esq.
      Saltzberg, Trichon, Kogan & Wertheimer, P.C.
      1818 Market St., 30th Floor
      Philadephia, PA  19103

I hereby certify that I mailed a copy of the within to counsel of record, as above.

Dated:    _8/27/04_    _B Del Signore_

# EXHIBIT 9

11/16/2004                                                                    John Valvo

Page 46

1    A. This was a loan -- we were going to refinance
2    the building, because at that time we owed
3    approximately 370,000. We knew it was coming up
4    in December, I believe the mortgage was
5    finishing, so we were getting started to do
6    refinancing on the building, plus we wanted some
7    extra money to do some repairs and things like
8    that and probably even to take some money out.
9    Q. So was V & M Holding looking to refinance the
10   existing Fleet mortgage?
11   A. Yes.
12   Q. And so V & M Holding went to Citizens Bank in
13   order to refinance the Fleet mortgage?
14   A. Say that again.
15   Q. V & M Holding was going to Citizens Bank to
16   refinance the existing Fleet mortgage?
17   A. Yes.
18   Q. It says, Dear V & M Holding: We've reviewed your
19   application for the request in the amount of
20   490,000. It says, We regret that we are unable
21   to grant your request for the following reasons.
22   Can you read the reasons there?
23   A. Insufficient financial strength of business,
24   insufficient income and/or business cash flow for
25   amount requested, debt to income ratio, unable to

Page 47

1    grant credit for the terms and conditions
2    requested.
3    Q. In this letter, sir, do you see any reference to
4    the word bankruptcy?
5    A. No, I do not.
6    Q. Do you see any reference to the term derogatory
7    credit?
8    A. Not derogatory, no.
9    Q. Do you know if Mr. Molk got a letter similar to
10   this one or was it just one letter sent to V & M
11   Holding Company?
12   A. I think one letter was sent to V & M Holding.
13   Q. That's the one we've got here marked as
14   Exhibit 5?
15   A. I believe so.
16   Q. Do you recall the terms of the Citizens Bank loan
17   that was referred to in this Number 5, the
18   turndown letter that we marked Exhibit 5, the
19   length and the interest rate that you sought?
20   A. The length probably would have been a 10-year
21   with a 20-year amortization. The interest rate,
22   no, I don't remember right off the top of my
23   head. For some reason either five or five and a
24   quarter sticks in my head, but I can't swear to
25   it.

Page 48

1    Q. Can you -- without simply guessing, can you
2    compare what the terms were that you were seeking
3    from Citizens as opposed to what you later got at
4    Fleet when you financed the Fleet mortgage with
5    Fleet?
6    A. You have to clarify the question for me.
7    Q. Sure. At the beginning of the deposition I think
8    you said that the Fleet mortgage V & M Holding
9    was looking to refinance and did in
10   December 2003, you refinance, or V & M refinanced
11   that mortgage with Fleet four or five months ago?
12   A. Right.
13   Q. What I'm asking, sir, is, can you tell me, is
14   there a difference between the terms that V & M
15   Holding got from Fleet this year as opposed to
16   what the terms V & M Holding was trying to get
17   from Citizens in July of 2003?
18   A. The amount was different. I believe the
19   Fleet amount was 450 something thousand. That's
20   number one. I believe the rate was different.
21   What the rate was exactly, I can't pin it down
22   unless I look into it a little further. But
23   those were two of the big differences. The
24   timeframe I believe was the same, 10 with a 20.
25   I believe the closing costs with them, from what

Page 49

1    they had broken down, would have been less than
2    Fleet.
3    Q. When you were denied the home equity loan back in
4    November of 2002, you did not reapply for another
5    home equity loan after that or did you?
6    A. I refinanced later on.
7    Q. When?
8    A. I'm going to again guess. Within the past 12
9    months.
10   Q. The past 12 months?
11   A. Yes.
12   Q. Did you have any trouble when you refinanced with
13   your credit, or did you just --
14   A. Well, I had to go -- I went to someone I
15   know. And I had to bring a letter from my
16   attorney stating that we were in suit for
17   discrepancies in the financial report. He was
18   able to secure me a mortgage.
19   Q. And how much was that mortgage for?
20   A. I believe I owed 90,000. I was looking for
21   150 or 145,000, somewhere around that.
22   Q. So you refinanced your home mortgage?
23   A. Yes, I did.
24   Q. Do you recall -- what was the name of the company
25   you refinanced with?

www.AlliedCourtReporters.com                    401-946-5500 / Toll Free 888-443-3767

11/16/2004                                                                John Valvo

Page 50

1    A. I went to American Mortgage on West Shore
2    Road in Warwick. He's a broker I believe, and he
3    finds mortgages. The reason why I went to him is
4    I had done some business with him over the past
5    20 years, and I had a relatively good rapport and
6    he did know me as a reputable person who had no
7    problems. And, like, what I showed him -- I was
8    able to sit down and explain to him about the
9    bankruptcy. And he -- when I showed him the
10   letter from the attorney, so on and so forth, he
11   took it into consideration when he went to buy a
12   mortgage or sell a mortgage or whatever they do.
13   Q. Do you recall the rate you were able to get?
14   A. Not off the top of my head.
15   Q. Was it a favorable rate based on the then current
16   market conditions to your knowledge?
17   A. I think from when I talked to him to when I
18   did it was about half a point difference. It
19   took him sometime I think to find me something.
20   But I'm not sure. But I think it was a quarter
21   to a half difference.
22   Q. Because of the delay or because of your report,
23   do you know?
24   A. That I couldn't answer you.
25   Q. I marked this as Exhibit 12. And I'm going to

Page 51

1    ask you if that document is the HUD One from the
2    closing of the loan we were just talking about.
3    A. Yes, it is.
4    Q. Now, if you could, turn to the last page of
5    Exhibit 12. It's a four-page document. If you
6    turn to the last page, there's a truth-in-lending
7    disclosure statement. It shows the APR to be
8    5.691, which as we all know who have done
9    closing, that's a bit higher than the actual rate
10   because it takes into account the finance charges
11   and such. Do you know -- based on that, can you
12   tell me what the actual rate was?
13   A. No, I can't.
14   Q. It was something lower than that?
15   A. I would assume so.
16   Q. So what we have here is dated November 12, 2003.
17   This is the refinance of the mortgage on your
18   home?
19   A. Yes, it is.
20   Q. So you actually never went and got another --
21   tried to get another home equity loan, you just
22   refinanced the whole loan?
23   A. After I cashed the bond in, I really
24   didn't -- can you excuse me.
25   (BRIEF TELEPHONE INTERRUPTION)

Page 52

1    A. I really -- what was the question again? I'm
2    sorry.
3    Q. I asked you whether you had gotten another home
4    equity loan in place of the one that you had been
5    denied in 2002, and I believe you said no. Then
6    I asked, did you actually just refinance your
7    existing mortgage on November 12, 2003?
8    A. Right. And the reason why I didn't do the
9    other thing is because I did sell the bond off,
10   and I was able to use that money for whatever I
11   had to do, what I wanted it for.
12   Q. Right. So you sold the bond for 127,000 of which
13   your daughter I guess got 40. What did you do
14   with the other $87,000?
15   A. I gave 40 to one son and 40 to another son.
16   What you do for one you must do for all three.
17   It started off as a loan, and it wound up as
18   three gifts.
19   Q. I respect that. When you refinanced your house,
20   did you take cash out?
21   A. I believe I did. If I remember, it was about
22   35 to 40,000.
23   Q. That's right. That's exactly the right number.
24   What was that money used for?
25   A. I just put it in my checkbook.

Page 53

1    MR. LUCKMAN: This should be marked 14.
2    (DEFENDANT'S EXHIBIT 14 MARKED FOR ID)
3    Q. We marked this document as D14. It's a letter
4    dated September 23, 2002. Do you recognize that,
5    sir?
6    A. Yes, I do.
7    Q. Could you tell me what this letter is?
8    A. This is a letter I had to send to Trans Union
9    because all they would do -- they wouldn't
10   discuss anything unless it was in writing. You
11   couldn't discuss anything with them on the phone,
12   so you had to send it in writing. I tried to put
13   in this letter where they made their mistakes,
14   where I thought they made their mistakes. Let's
15   put it that way. Where I thought they made their
16   mistakes to correct the credit report.
17   Q. Prior to sending this letter on September 23,
18   2002, had you received a copy of your credit
19   report?
20   A. I believe I did receive a copy of the credit
21   report prior to this letter. This was -- I
22   believe I received a copy of it. That's how I
23   knew where I thought they made the mistakes.
24   Q. And what number did you try to call to discuss
25   your report?

# EXHIBIT 10

11/16/2004                                                         John Valvo

Page 54

1    A. At Trans Union?
2    Q. Yes. Do you know where you got the number from?
3    A. Oh, yeah. I got it from -- when you're
4    denied, as I'm sure you know, you're entitled to
5    a credit report. You call, you talk to, for lack
6    of a better word, a machine. You enter in your
7    report. A few days later, they send you out the
8    report. Then you can call and talk to a person.
9    I got the report, I called, I talked to a person,
10   got nowhere with her. You have to send it in
11   writing.
12   Q. Did she suggest to you that you put it in
13   writing?
14   A. No. She told me that was the only way they
15   would even look at it or discuss it.
16   Q. Okay.
17   A. That's what I had to do. So we put it all --
18   we marked down what we knew was not ours on the
19   credit report and I believe I sent this letter
20   along with it telling them where I believe they
21   made their mistakes in screwing everything up.
22   Q. So you think you sent something with this letter?
23   A. I believe the credit report went with the
24   letter.
25   Q. And you think you made marks on that credit

Page 55

1    report that you sent with this letter?
2    A. I'm positive we made marks on it. I don't
3    know what comment was made -- either no or yes.
4    I believe it was no and yes. Yes, no, no, yes,
5    yes.
6    Q. Can you read for me what's in the handwriting at
7    the bottom of this page?
8    A. No, I can't.
9    Q. Whose handwriting is that?
10   A. It looks like my wife's. No -- I'm sure she
11   can read it.
12   Q. It looks to me -- it looks like, no investigation
13   form was included. Also please send me my
14   corrected credit report ASAP. Does that look
15   fair enough?
16   A. That's as good a guess as I could have made.
17   I have no idea what it means.
18   Q. But that's what it looks like?
19   A. That's what it looks like.
20   Q. So your signature but your wife's handwriting?
21   A. Yes.
22   Q. Did you get a response to this letter from Trans
23   Union?
24   A. I believe we got another credit report with
25   some stuff taken off. Again, I'm doing this from

Page 56

1    memory.
2    Q. I'm going to help you there.
3    A. It was quite a while ago.
4    Q. Right. Other than the phone call when you were
5    told you had to send in a letter, this letter
6    that we marked as Exhibit 14 dated September 23,
7    2002, have you made any other calls or sent any
8    other letters to Trans Union disputing
9    information?
10   A. I think I called them again. I think I got
11   rather indignant with them on the phone that they
12   had not corrected it. Again, this is quite a
13   while ago. I didn't get anywhere with her. I
14   believe she hung up on me. I did get indignant
15   with her.
16   Q. Do you recall -- other than that telephone call,
17   do you recall any letters sent after
18   September 23, 2002 to Trans Union disputing
19   information in your report?
20   A. Off the top of my head I can't remember. I
21   don't know.
22   Q. If you had copies, would you have given them to
23   your lawyer?
24   A. I believe I would have, yes.
25   Q. The next document I have is marked D7. I'll just

Page 57

1    tell you, this may be in a format or a type face
2    a little different than what you've seen. But do
3    you recall after your dispute, September 23, do
4    you recall getting a report from Trans Union with
5    the results of the reinvestigation?
6    A. What date did you say again?
7    Q. Well, the dispute is September 23, 2002, and what
8    we've marked as D7 is 10/15/2002. Do you recall
9    receiving this document?
10   A. I think so, yeah.
11   Q. And as you said earlier, some things were
12   deleted; some things were not?
13   A. Right.
14   Q. On the first page it shows certain items are
15   deleted. At the top there it's got ██████████,
16   that's your Social?
17   A. Say it again.
18   Q. ██████████ --
19   A. Yes, it is.
20   Q. What's ██████████
21   ██████ |2/43.
22   Q. Is that your phone number, the 949 number?
23   A. No.
24   Q. That's not?
25   A. Wait a minute. Not at this time. This was

15 (Pages 54 to 57)

# EXHIBIT 11

11/16/2004                                                                            John Valvo

Page 70

1    did you contact Trans Union?
2    A. I don't believe so. Not off the top of my
3    head that I can think of.
4    Q. Between that date, August 8, 2003 and the time
5    the lawsuit was filed, do you recall writing any
6    letters to Trans Union?
7    A. No.
8    Q. Any phone calls?
9    A. There might have been one phone call, but I
10   can't swear to it.
11   Q. Is this currently a mortgage on your home, sir?
12   A. Yes.
13   Q. And that would be the one that we saw in the
14   papers?
15   A. I believe so.
16   Q. You haven't refinanced that one yet? You haven't
17   refinanced the one that we looked at, the HUD
18   One?
19   A. I think it's only been five or six months.
20   Q. I've got to ask.
21   A. Okay.
22   Q. Am I correct, sir, that you haven't received any
23   medical treatment which you would connect to
24   Trans Union or Trans Union's actions or
25   inactions?

Page 71

1    A. No.
2    Q. I'm not correct or I am correct?
3    A. You are correct. I'm sorry.
4    Q. Did you -- you borrowed money for an automobile
5    from Citizens Bank in October of 2003?
6    A. I don't know from what bank I borrowed it
7    from.
8    Q. But that was for the car in Florida?
9    A. $14,000?
10   Q. Yes.
11   A. Give or take a few bucks.
12   Q. That was the Citizens Bank loan?
13   A. I would assume that's what it was for.
14   Q. I misspoke. That's for the car that you're
15   keeping in Florida?
16   A. Exactly right.
17   Q. Do you have a home in Florida?
18   A. I have a condo.
19   Q. Where is that located?
20   A. Hallandale.
21   Q. Is there a mortgage on that property?
22   A. No.
23   Q. When did you acquire that property?
24   A. To guess --
25   MR. REDIHAN: Don't guess.

Page 72

1    A. -- eight to ten years ago.
2    Q. Is that in your name?
3    A. It was in my wife's name -- it was in both
4    our names. About three years ago, four years
5    ago, I gave it to her as a present.
6    Q. So now the property in Florida is in your wife's
7    name only?
8    A. Right. She loves it down there so much, and
9    I hate it down there so much. So I figured she
10   should keep it.
11   Q. And that was very generous, sir. Mr. Valvo, have
12   you ever been convicted of a crime?
13   A. No, sir.
14   Q. Has your company ML Roberts ever been
15   investigated by the government for any reason?
16   A. Knock on wood, no.
17   MR. LUCKMAN: I think I'm finished.
18   Thank you very much, sir.
19   THE WITNESS: You're welcome, sir.
20   THE REPORTER: Mr. Redihan, would you
21   like a copy of the transcript?
22   MR. REDIHAN: Yes, please. Just a
23   regular copy.
24   MR. LUCKMAN: Mini and an E-mail.
25   (DEPOSITION CLOSED AT 12:20 P.M.)

Page 73

1
2    C E R T I F I C A T E
3
4    I, DENISE A. WEBB, a Notary Public in and for
the State of Rhode Island, duly commissioned and
5    qualified to administer oaths, do hereby certify that
the foregoing Deposition of JOHN VALVO, a PLAINTIFF in
6    the above-entitled cause, was taken before me on
behalf of the DEFENDANT at The Law Offices of
7    Satzberg, Trichon, Kogan & Wertheimer, Rhode Island on
November 16, 2004 at 10:00 a.m.; that previous to
8    examination of said WITNESS who was of lawful age, he
was first sworn by me and duly cautioned to testify to
9    the truth, the whole truth, and nothing but the truth,
and that he thereupon testified in the foregoing
10   manner as set out in the aforesaid transcript.
11
I further certify that the foregoing Deposition
12   was taken down by me in machine shorthand and
transcribed by computer, and that the foregoing
13   Deposition is a true and accurate record of the
testimony of said WITNESS.
14
15   Pursuant to Rules 5(d) and 30(f) of the Federal
Rules of Civil Procedure, original transcripts shall
16   not be filed in Court; therefore, the original is
delivered to and retained by Defendant's Attorney,
17   Bruce S. Luckman, Esquire.
18
Reading and signing of the transcript was not
19   requested by the Deponent or by any Parties involved
upon completion of the Deposition.
20
21   IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 18th day of November, 2004.
22
23   _____
24   DENISE A. WEBB, CSR/RPR/NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 7, 2006
25

19 (Pages 70 to 73)

# EXHIBIT 12

03 027

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

JOHN VALVO

    VS                                        C. A. NO. 04 70S

TRANS UNION, LLC

### AFFIDAVIT

I, John Valvo, being duly sworn hereby make affidavit and say:

1.     I was denied credit in September and November of 2002 based on inaccurate information in a Trans Union Credit report.

2.     As a result, I was humiliated and embarrassed in dealing with my bank, in applying for credit cards and in refinancing my home and in refinancing my business.

_____
John Valvo

Subscribed and sworn to before me under penalty of perjury this 25th day of July, 2005.

_____
Notary Public
Robert O. Valvo
ID# 45532 - Comm. Exp. 08/12/2007