03 027

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

JOHN VALVO

VS C. A. NO. 04 70S

TRANS UNION, LLC

**OBJECTION OF PLAINTIFF TO MOTION OF DEFENDANT TO SUPPLEMENT REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff hereby objects to the defendant's motion to supplement its reply to the plaintiff's opposition to summary judgment. Plaintiff relies on the attached memorandum

CHARLES N. REDIHAN, JR. (1810)
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI 02903
(401) 831-2900
(401) 331-7123 FAX

TO: Kevin C. Glavin, Esq.
Cutcliffe, Glavin & Archetto
155 South Main Street, Suite 300
Providence, RI 02903

Mark E. Kogan, Esq.
Bruce S. Luckman, Esq.
Timothy P. Creech, Esq.
Saltzberg,Trichon,Kogan & Wertheimer,PC
1818 Market St., 30th Floor
Philadelphia, PA 19103

CERTIFICATION

I hereby certify that I mailed a copy of the within to counsel of record, as above.

Dated: September 16, 2005

B. Braun
______________________________

03 027

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

JOHN VALVO

VS C. A. NO. 04 70S

TRANS UNION, LLC

**MEMORANDUM OF PLAINTIFF IN SUPPORT OF HIS OBJECTION TO DEFENDANT'S MOTION TO SUPPLEMENT REPLY**

At the time of the oral argument on the defendant's motion for summary judgment, the court asked plaintiff's attorney about evidence in regard to the claim of emotional distress. Plaintiff's attorney in response to the court's inquiry stated that Stephanie Parker, Mr. Valvo's daughter, will testify about her father's behavior and condition during the time in question. Defendant in its memorandum argues that insufficient evidence was obtained at Mrs. Parker's deposition. This argument ignores the opportunity plaintiff has to present her testimony at trial and to ask the questions pertinent to the claim. Defendant's attorney did not ask such questions at her deposition. He asked only about her knowledge of her father's credit. He did not ask about her father's demeanor and behavior and complaints. The plaintiff will be able to present this testimony at trial at length. The only issuehis stage is whether a question of fact exists and plaintiff submits his affidavit establishes. No countervailing evidence has been presented by the defendant.

The defendant's representation about Mrs. Parker's need for the money from her father is inaccurate. Her deposition was not included in defendant's motion for summary judgment. Defendant's attempts to summarize it in the memorandum are inappropriate. In fact, Mrs. Parker did have need for the money from her father to be able to purchase and keep a valuable piece of property that was only going to become more expensive as time went on. She further stated that she could not get a construction loan on her new home until her existing home was sold since she was carrying indebtedness on both the existing and new properties. It was important for her to pay down her indebtedness as much as possible. Mrs. Parker's testimony is not contradictory. Attached are additional pages from her deposition.

The matters raised by the defendant in its memorandum are not new and, plaintiff submits, are simply a re-argument of issues already raised. Defendant's motion, therefore, should not be allowed.

CHARLES N. REDIHAN, JR. (1810)
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI 02903
(401) 831-2900
(401) 331-7123 FAX

TO: Kevin C. Glavin, Esq.
Cutcliffe, Glavin & Archetto
155 South Main Street, Suite 300
Providence, RI 02903

Mark E. Kogan, Esq.
Bruce S. Luckman, Esq.
Timothy P. Creech, Esq.
Saltzberg,Trichon,Kogan & Wertheimer,PC
1818 Market St., 30th Floor
Philadelphia, PA 19103

CERTIFICATION

I hereby certify that I mailed a copy of the within to counsel of record, as above.

Dated: September 16, 2005

B Brown

A. '98? I was living in Jastram, J-A-S-T-R-A-M, Street in Providence, then I would have moved to East Avenue in North Providence where my soon-to-be husband lived.
Q. East Avenue?
A. Uh-huh, North Providence.
Q. Were either of those homes?
A. The last one, East Ave.
Q. That was a home?
A. Uh-huh, my husband had owned it previous to us being married.
Q. Jastram, that's an apartment?
A. Yes.
Q. How long did you live at East Avenue?
A. From when we got married, which was '99, until 2002.
Q. East Avenue from '99 until 2002?
A. Actually '98, '99, 2000, 2001 -- dates, I don't remember exactly when we moved in.
Q. We're close enough. In 2002, where did you move?
A. To where my parents live, 93 Lookout Avenue, Johnston.
Q. 93 Lookout Avenue?
A. Yes.
Q. In Johnston. How long have you lived there?



A. We've been living there since April of 2002. I got it wrong when I said 2003.
Q. I've got a different way to ask you --
A. It's got to be 2002, because it's going to be two years, so it's got to be 2002.
MR. REDIHAN: This is 2005.
Q. Let me ask it a different way. Did you live anywhere between East Avenue and your parents' house?
A. No.
Q. So you moved from East Avenue to your parents' house?
A. Yes. Sorry, the dates are just --
Q. It's all a blur?
A. Yeah.
Q. Don't be insulted, I usually ask everyone this question. I didn't ask your brother, but I'll ask you. I know you're pregnant, but are you on any sort of medications today that would effect your ability to answer my questions?
A. No.
Q. My favorite response to that was a big-time insurance guy in Manhattan. I asked him, he said, "I don't know." Then he gave me a list of what he was on, and said, "I'm not sure what they can do." In any event.
Have you ever owned a home in your name or yours and your husband's name?



A. No, I believe we never changed when we got married, the house still stayed in his name.
Q. The East Avenue --
A. No, it was put in my name. Yes, I'm sorry. My name was put on the mortgage -- on the deed of the house.
Q. On East Avenue?
A. Yes.
Q. Any other home that you had your name on?
A. No.
Q. Have you ever built a home?
A. We are in the process of building now.
Q. Can you describe for me who is living with you at your parents, other than your two children?
A. Just my mother and father.
Q. Where is your husband living?
A. With me, with us. I'm sorry. I thought that was just assumed. I'm sorry.
Q. I try not to assume anything, I never know where it will get me. So you're living at 93 Lookout with your husband, what is his name?
A. Keith.
Q. And what does Keith do?
A. Keith owns a home remodeling business.
Q. How long has he been doing that?



A. He's been the sole owner for -- when we got married, about 2000, so the last five years.
Q. What is the name of the business?
A. Parker's Vinyl Creations.
Q. What kind of remodeling do they do?
A. Basically exterior: Roofing, siding, windows, that type of work.
Q. Is that a family business?
A. No.
Q. Was it always called Parker's Vinyl?
A. Yep.
Q. You said he was the sole owner?
A. He had had a partner in a different company before, only in his partner's name. And he was a partner, but it was under his partner's full name. It was Robert Goodwin Siding. It was his partner's name and he was taken on as a partner after so many years. But this is the company he started himself.
Q. See, when I assumed it was a family business, I was wrong. You're in the process of building a home?
A. Uh-huh.
Q. Where?
A. Scituate, Rhode Island.
Q. What is the address?
A. Oakwood Drive, 34, maybe.

Page 10

Q. What was that?
A. 34, maybe, Oakwood Drive.
Q. But it's Oakwood Drive?
A. Yes.
Q. Do you know the address of 133 Winterberry Road? Do you know what that is?
A. I never heard of it.
Q. In Saunderstown, Rhode Island?
A. Never heard of it.
Q. What is located at 34 Oakwood Drive, some type of development?
A. It's a new development that is being put up, three-acre lots for a two-phase development. Two-phase development, 34 houses.
Q. Who is doing the development, do you know, who is the builder?
A. The builder of the development -- my husband is the contractor on our house, the general contractor, but the development, David Annesse Construction.
Q. Can you spell that?
A. A-N-N-E-S-S-E, I believe.
Q. I didn't understand what you meant by two phase?
A. It's just going up in two phases. The first phase was 15 houses and the second phase was the rest of the houses.

Page 11

Q. When did the first phase start, do you know?
A. We bought and started our house, I mean, our land was bought during phase one, before they started selling off land in phase two. I don't know when the whole development started. But we had purchased our land in, oh, Lord, 2003. No. Yeah. I have -- I cannot remember when. Because we were still living -- 2002 we had purchased our land, when we were still living at East Avenue we purchased our land, so.
Q. So that would have been when in 2002?
A. I want to say fall, to tell you the month, I cannot remember. Because it was before Christmas.
Q. It was before Christmas?
A. Yeah, it was fall. September, October, I believe.
Q. How did you finance the purchase of the land, do you recall?
A. We actually went to the bank to take out a home -- to take equity out of the house, because I was going to start a business. And then we ended up, we were able to pull $60,000 of equity --
Q. This is East Avenue?
A. East Avenue, and instead of starting a business we bought a piece of land.
Q. How much was the land, do you recall?
A. 125.

Page 12

Q. How did you finance the rest of the purchase?
A. The rest -- we put sixty down and the rest was financed through Annesse Construction. He financed -- or was it the credit union? It was done so we could finance the rest of the money. It was all right with who we bought it from to, I believe we -- Green (sic) Credit Union? Yeah, we financed the rest with a credit union because we were paying monthly payments on the land after we put sixty down.
Q. So you put down almost half and financed the rest through a credit union?
A. Yes.
Q. How long did you continue to make payments on the land?
A. Up until the day we took out our construction loan, we ended up paying it off in full. We had made other payments, chunk payments, but then it wasn't fully paid until we took out our construction loan to start construction, and we paid the rest of our land off with a portion of the construction loan.
Q. Do you recall when that was?
A. When did we start?
Q. That was actually a better question. When did you start construction?
A. It would have been when we took the loan out, which would be -- I should have looked up these dates. I would have had better dates for you. We started construction a year ago in November.

Page 13

Q. November, 2003?
A. Yes, because this past November, 2004, we had been working on it a year.
Q. When you say we're working on it, your husband is doing it?
A. Yes.
Q. He's the general contractor?
A. Yes.
Q. Does he do any other work with Annesse Construction?
A. No.
Q. Did he have any connection to the project other than this purchase?
A. Nope.
Q. Is he doing any other houses at the project?
A. No.
Q. So your best estimate is that in November, 2003 you got a construction loan, started work and paid off, whatever, Green Credit Union, or whoever it was, that you borrowed money from to pay for the land?
A. Uh-huh, I think we ended up owing somewhere in the twenty-somethings left on the land.
Q. You said you made some lump sum payments down on the

land?
A. Yes.
Q. What sort of lump sum payments did you make, do you recall when or why?
A. We had given my -- we had gone to my father for a loan to borrow money to pay for another portion of the land and he had given us almost 40,000 that we put towards the land.
Q. When was that?
A. That was after the first of the year in 2003.
Q. When you said the other portion of the land, what do you mean by that?
A. What did I say? Other portion.
Q. That's why we have a record. It sounded like, did you buy more land?
A. No, no. In full payment.
Q. I'm a little confused. You bought the land around November 2002 or earlier?
A. Yes.
Q. Around there?
A. Yes.
Q. A little earlier, you think?
A. Yes. After Christmas, after my father gave us money we put more money down on the land.
Q. That was to pay down the loan?



A. Yes, not -- I worded it wrong.
Q. I got you. So your father gave you a gift at some point?
A. Yes.
Q. After Christmas?
A. Half before Christmas and half after the first of the year.
Q. He gave you that gift and you just paid down your land loan?
A. Yes.
Q. With the gift?
A. Yes.
Q. When you got the land, and let's just call it November, was there a reason you chose to buy it in November, as opposed to after, before, after? Why did you pick that particular time to buy it?
A. We just happened to -- land in Rhode Island is, especially where we were trying to build, it was very scarce, so once we found something in our price range we jumped. And we actually, we had a substantial down payment from equity that we had pulled from the house, so we just did it.
Q. Could you have carried the loan for more months than you did at the full amount of 65,000? Did you have the necessary income to continue making your payments



on the loans you had?
A. Yes.
Q. So life was easier when you paid it down, but you were able to carry the burden?
A. Yes. We were trying to pay it off as quickly as we could, too. Also because we were applying for a construction loan and now having -- we still hadn't sold the house, so we had the mortgage and now we had the mortgage on the land. So, we were trying to, any way we could figure out how to get that number down at that point in time. That is how it was for us.
Q. Would it be fair to say that when you went to get a construction loan you wanted to be in a position where you didn't have a land loan, or much of a land loan to pay off?
A. Exactly.
Q. How did you decide to get the construction loan in 11/2003, as opposed to some later date?
A. We hadn't sold the house yet. We had gone and talked to a few places, mortgage companies, and there was no way we were getting a construction loan before we sold our house.
Q. Before you sold East Avenue?
A. Right.
Q. Did you have a mortgage on East Avenue or just the



home equity loan?
A. It was, we refinanced and it was still just one mortgage payment after we refinanced.
Q. Did you have any trouble with your credit or with your husband's credit in doing all these loan transactions?
A. No.
Q. You were able to get the best available rates each time you went to a bank?
A. Yes, well, yeah, we were fine. Because we had, when we had gone for the loan on the land our credit went through no problem, to my recollection.
Q. You never had to contact a consumer reporting agency to complain about any inaccuracies?
A. No.
Q. At about the time you were getting a land loan and acquiring the land in Scituate, did you have any discussions with your father about credit?
A. My credit?
Q. Your credit?
A. No.
Q. How about his?
A. Nope.
Q. Did you ever hear anything about your father's credit before a month or two ago when you discussed this lawsuit for the first time?