03 027 CNR:SH 11/8/05

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

JOHN VALVO

VS C. A. NO. 04 70S

TRANS UNION, LLC

**OBJECTION TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE**

The plaintiff, John Valvo, objects to the Report and Recommendation of Magistrate Judge Lincoln D. Almond granting in part defendant's motion for summary judgment. Plaintiff does not object to that portion of the Magistrate Judge's decision granting the motion in respect to (a) Business Damages and (b) Damages reported on Experian's Credit Reports. This objection is limited to plaintiff's claim that defendant willfully violated the Fair Credit Reporting Act ("FCRA"). Plaintiff respectfully submits that there is before the Court sufficient evidence of the existence of a genuine issue of material fact and defendant's motion for summary judgment on this claim should have been denied. Plaintiff submits that the Magistrate Judge's finding to the contrary is erroneous and should be reversed.

Rule 56 of the Federal Rules of Civil Procedure authorizes the Court to grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ. P. 56(c) "In this context, 'genuine' means that the evidence could resolve the point in favor of the nonmoving party, while material means that the fact has the potential to affect the outcome of the suit under the applicable law." Richardson vs Fleet Bank of Massachusetts, 190 F Supp. 2d 81, 84 (D.C. MA 2001) quoting NASCO, INC. vs Public Storage Inc., 29 F 2d 28, 32 (1st Cir. 1994).

Under the FCRA, a credit reporting agency is liable for a "willful violation" of the Act when it has "knowingly committed an act in conscious disregard for the rights of others." Pinner vs Schmidt, 805 F 2d 1258, 1263 (5th Cir. 1986), cert denied 483 US 1022. Malice or ill will need not be proven. Stevenson v TRW, Inc., 987 F 2d 288, 294 (5th Cir. 1993).

The willful violation in the instant case is not based upon the re-investigation of the plaintiff's claim per se but on the verification procedures instituted and utilized by Trans Union. FCRA §1681(e)(b) requires a consumer reporting agency to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." It is plaintiff's position that Trans Union operates its consumer verification division without adequate safeguards to insure the accuracy of its credit reports. In doing so, it fails to fulfill the statutory mandate of insuring maximum possible accuracy and is consequently a willful violation of the FCRA.

After receiving notice from plaintiff, John Valvo, that there were inaccurate entries in his credit report, Trans Union caused computer generated consumer dispute verification form to be sent to the creditors in question in order to verify the personal and financial data about plaintiff which these creditors had previously furnished to Trans Union. Trans Union also contracts with an independent vendor which is responsible for checking the accuracy of public records such as lien notices and court filings. A similar consumer dispute verification form about the plaintiff was submitted to this vendor also. The information obtained by the vendor was returned to Trans Union where an operator compared the entries and wass supposed to make the appropriate data entry either verifying the consumer information in dispute or correcting it. In the instant case, the operated failed to do this.

Only samples of the operator's work is reviewed by a supervisor. The supervisor follows no established standard or formula in selecting the work to be reviewed. (See Exhibit A, deposition testimony of Eileen Little, pp 70-71 and 73-74). Apart from this random review by the supervisor, there are no other controls, checks or safeguards on the work of the operator.

Trans Union does not cross check the information on the verification forms by computer or any other means. The only quality control on the operator's work is a review of samples of his work selected at random by a supervisor (Exhibit B, Little deposition p. 78, l. 3-10) who is also responsible for overseeing 15 other employees. (Exhibit C, Little deposition p. 76, l. 1-17).

In most instances there is no supervision of the operator's work at all. If he or she fails to detect changes or to make corrections on the credit report and if these failures are not noticed when reviewed by the supervisor or not reviewed at all, then the operator's mistake goes undetected, and the inaccurate information remains in the consumer's credit report. (Exhibit D, Little Deposition p. 79, l. 9-15). The hit or miss nature of this procedure clearly raises questions about whether it is sufficiently reliable to provide the most accurate consumer credit information possible.

Whether Trans Union's continued use of an investigatory system with such minimal oversight and quality control provisions constitutes a willful violation of the FCRA is a question of fact. Whether the recurrent errors in plaintiff's report were the result of an isolated operator's mistake as defendant asserts or the fault of Trans Union's investigatory system is also an issue of fact. Clearly these are factual determinations and not issues that can be determined as a matter of law. This case is somewhat similar to Barron vs Trans Union, 82 F Supp 1288 (N.D. AL 2000) wherein the Court denied summary judgment on a claim for willful violation of the FCRA where the plaintiffs social security number and credit card number continued to be overlooked by the defendant which credit reporting agency persisted in failing to note inaccurate entries on plaintiff's credit card report. The Court in denying defendant's motion found that a factual dispute existed about whether defendant willfully failed to follow reasonable procedures to insure that its credit reports were accurate.

Plaintiff submits that a genuine issues of material fact exist as to whether or not defendant willfully violated the Fair Credit Reporting Act by maintaining an unreliable

reinvestigation system. The existence of this issue warrants overturning the decision of Magistrate Judge Almond on plaintiff's claim for willful violation of the Fair Credit Reporting Act.

CHARLES N. REDIHAN, JR. (1810)
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI 02903
(401) 831-2900
(401) 331-7123 FAX

TO Kevin C. Glavin, Esq.
Cutcliffe, Glavin & Archetto
155 South Main Street, Suite 300
Providence, RI 02903

Mark E. Kogan, Esq.
Bruce S. Luckman, Esq.
Timothy P. Creech, Esq.
Saltzberg,Trichon,Kogan & Wertheimer,PC
1818 Market St., 30th Floor
Philadelphia, PA 19103

CERTIFICATION

I hereby certify that I mailed a copy of the within to counsel of record, as above.

Dated: November 10, 2005

A. No. We generate the verification form back to the vendor to have them go back and research the information with the source of the information the courthouse.

Q. So you actually generate a form that would go to the vendor. In this case I believe it's Hogan?

A. Yes.

Q. And then Hogan completes this form?

A. Yes.

Q. Okay. Can you show me, if you would, please, on what part is completed by Trans Union before it's sent to Hogan?

A. The left-hand side with all the consumer's information.

Q. Yes.

A. The public record information --

Q. Okay.

A. -- as it was reported at the time of the dispute.

Q. Yes.

A. And then, you know, what the consumer is stating.

Q. All right. And Hogan or the vendor

would complete the right-hand upper side?
A. Right-hand side. And then if they were indicating any changes, they would fill in the response codes.
Q. Okay. And the response codes are at the lower left?
A. Right.
Q. What is a response narrative? What's that for?
A. Where they're putting a free form comment with instructions there.
Q. Now, on this particular form it appears Hogan is indicated on the left side -- on the right side just the consumer's name and Social Security number, am I correct?
A. They're verifying a change, yes.
Q. Okay. They're verifying that that is the name and the Social Security number of the person that filed bankruptcy?
A. Yes.
Q. And then what other information did Hogan give you?
A. They were telling us to the change the type of bankruptcy. We were reporting it

verify whether or not, in fact, John Valvo was the person who filed the bankruptcy?

A. Yes.

Q. And they haven't done that; is that right?

A. Well, they did do that, yes.

Q. What do you mean they did do that?

A. They did verify that they had a different middle initial and a different Social Security number.

Q. But they're saying otherwise the way that's being interpreted as otherwise it's the same person or is it -- would it be interpreted by Trans Union as they are two different people?

A. I believe it should have been interpreted as there's two different people, different Social Security number.

Q. All right. And that being the case the bankruptcy should have been removed from Mr. Valvo's credit report, correct?

A. I would think so, yes.

Q. Do you know why that wasn't done?

A. I would have to say the operator just

-- I don't know why he missed it. I can't explain that.

Q. Who was the operator on this?

A. It was a Brian.

Q. Cawthorne?

A. Yes.

Q. Is he still with Trans Union?

A. No.

Q. When did he leave?

A. I believe it was October of '02.

Q. And why did he leave, if you know?

A. He was just a temporary associate.

Q. Was he terminated --

A. I don't believe that, no.

Q. -- because of his performance?

A. No.

Q. He was a temporary hire and the time was up?

A. Yes.

Q. You didn't need him any more, something like that?

A. Uh-huh.

Q. Did Trans Union have any problem with his performance while he was working there?

# EXHIBIT B

Cawthorne that did this?
A. Yes.
Q. Now, the work that the team leader supervises, how is that selected?
A. It's just random. I mean, there's no --
Q. Is there any kind of formula or standard that Trans Union instructs the team leader to follow?
A. No.
Q. You just go in and take --
A. Uh-huh.
Q. Okay. Is there any record of these audits?
A. I don't know if they would still have them. At that time they would have the records and then cover it with the associate at the month end. They would have a meeting with them every month. Okay. This is where you stand. This is how you rate, you know, what your rating was.
Q. Are the minutes kept of those records?
A. No.

# EXHIBIT C

ask you the question, if I may. Who would supervise someone in Brian Cawthorne's position?

A. He had a team leader. He had a department manager and then I'm responsible for the department manager.

Q. And how would the team leaders supervise his work?

A. They do audits. They do quality control. You know, they check a portion of his work each month. I mean, every piece is not quality controlled, but they'll take his work and do every 15, every 10 pieces just spot check that way.

Q. And how many people is this team leader responsible for?

A. 15.

Q. And what's the team leader's name at the time?

A. This was in '02. I don't know offhand who was there in '02. I would have to get you that. I don't know.

Q. Okay. That information would be available?

# EXHIBIT D

Q. They have performance ratings, that type of thing?

A. Right.

Q. Are those written or --

A. Well, yeah. The consumer -- the associate would get something and then the team leader would have something saying where they fell that month.

Q. All right. So in a situation such as this one if Brian Cawthorne was someone in his position makes a mistake if it's not one of the -- if the account is not one that the team leader is reviewing, it would be fair to say the mistake would go undetected?

A. Yes.

Q. So the only safeguard there on the operators and the people receiving this information is the random check and the diligence of the person, the operator?

MR. LUCKMAN: Object to the form.

MR. REDIHAN: All right. Let me rephrase it.

BY MR. REDIHAN:

# EXHIBIT E

Q. Thank you.
A. Uh-huh.
Q. 13?
A. A CDV on a public record set.
Q. Okay. This pertains to the bankruptcy, does it not?
A. Yes, it does.
Q. Okay. Do you have any way of telling by looking at this whether this was generated in-house?
A. They're all generated in-house.
Q. All generated in-house?
A. Yes.
Q. The public record vendors are just supplying information on a continuous process?
MR. LUCKMAN: Object to the form.
MR. REDIHAN: Okay. I don't blame you.
BY MR. REDIHAN:
Q. When Trans Union is called upon to verify the information in a consumer's public records, does Trans Union do this in-house by referring to its database?

A. No. We generate the verification form back to the vendor to have them go back and research the information with the source of the information the courthouse.

Q. So you actually generate a form that would go to the vendor. In this case I believe it's Hogan?

A. Yes.

Q. And then Hogan completes this form?

A. Yes.

Q. Okay. Can you show me, if you would, please, on what part is completed by Trans Union before it's sent to Hogan?

A. The left-hand side with all the consumer's information.

Q. Yes.

A. The public record information --

Q. Okay.

A. -- as it was reported at the time of the dispute.

Q. Yes.

A. And then, you know, what the consumer is stating.

Q. All right. And Hogan or the vendor

would complete the right-hand upper side?
A. Right-hand side. And then if they were indicating any changes, they would fill in the response codes.
Q. Okay. And the response codes are at the lower left?
A. Right.
Q. What is a response narrative? What's that for?
A. Where they're putting a free form comment with instructions there.
Q. Now, on this particular form it appears Hogan is indicated on the left side -- on the right side just the consumer's name and Social Security number, am I correct?
A. They're verifying a change, yes.
Q. Okay. They're verifying that that is the name and the Social Security number of the person that filed bankruptcy?
A. Yes.
Q. And then what other information did Hogan give you?
A. They were telling us to the change the type of bankruptcy. We were reporting it

as -- originally reporting it as a discharge bankruptcy and then at the bottom it says update to 7F which is just an open bankruptcy.

Q. All right. And do you see to the left there where it says update date?

A. Yeah. They were changing the date.

Q. Is that March 10th of '98?

A. '98 yes.

Q. Okay. And to the left of that it says data not verified or incorrect and status not changed?

A. Right. That's their narrative response, but it doesn't make sense.

Q. Doesn't make sense?

A. No.

Q. Well, why doesn't it make sense?

A. Because they're either verifying the information based on this or giving us the additional information. And when they say status not changed, are they talking about the type of public record? What status? They're asking us to change the status from a discharge bankruptcy to an open bankruptcy.

Q. But the form called for the vendor to

verify whether or not, in fact, John Valvo was the person who filed the bankruptcy?

A. Yes.

Q. And they haven't done that; is that right?

A. Well, they did do that, yes.

Q. What do you mean they did do that?

A. They did verify that they had a different middle initial and a different Social Security number.

Q. But they're saying otherwise the way that's being interpreted as otherwise it's the same person or is it -- would it be interpreted by Trans Union as they are two different people?

A. I believe it should have been interpreted as there's two different people, different Social Security number.

Q. All right. And that being the case the bankruptcy should have been removed from Mr. Valvo's credit report, correct?

A. I would think so, yes.

Q. Do you know why that wasn't done?

A. I would have to say the operator just

-- I don't know why he missed it. I can't explain that.

Q. Who was the operator on this?

A. It was a Brian.

Q. Cawthorne?

A. Yes.

Q. Is he still with Trans Union?

A. No.

Q. When did he leave?

A. I believe it was October of '02.

Q. And why did he leave, if you know?

A. He was just a temporary associate.

Q. Was he terminated --

A. I don't believe that, no.

Q. -- because of his performance?

A. No.

Q. He was a temporary hire and the time was up?

A. Yes.

Q. You didn't need him any more, something like that?

A. Uh-huh.

Q. Did Trans Union have any problem with his performance while he was working there?

A. No.
Q. How long was he working there?
A. I believe it was almost a full year.
Q. Were there any notes that he would produce in connection with this to explain why he did or didn't do what he did?
A. No.
Q. None?
A. Yes; no.
MR. LUCKMAN: The answer was no.
THE WITNESS: I mean he had access to it. He could have put a comment in that screen. I told you the comment screen before. But I just believe it was a mistake and he didn't even realize the mistake.
BY MR. REDIHAN:
Q. Now, what should have been done upon receiving this information?
A. Based on their response and the fact that they have a different social, it should have been cloaked.
Q. Okay. Thank you.
A. Uh-huh.
Q. Before I have you look at 14, let me

ask you the question, if I may. Who would supervise someone in Brian Cawthorne's position?

A. He had a team leader. He had a department manager and then I'm responsible for the department manager.

Q. And how would the team leaders supervise his work?

A. They do audits. They do quality control. You know, they check a portion of his work each month. I mean, every piece is not quality controlled, but they'll take his work and do every 15, every 10 pieces just spot check that way.

Q. And how many people is this team leader responsible for?

A. 15.

Q. And what's the team leader's name at the time?

A. This was in '02. I don't know offhand who was there in '02. I would have to get you that. I don't know.

Q. Okay. That information would be available?

A. Yes.

Q.. Okay. Mr. Cawthorne's address be available also?

A. I don't know. I mean, he wasn't a Trans Union associate. He was through a temp agency.

Q.. The temp agency name and address be available?

A. I would have to get you that.

Q.. Okay. If you would, please. 14 is public record set detail?

A. Right. This will show you the change that the operator did go in and make.

Q.. Okay. And in this case he changed it from a discharge bankruptcy to an ongoing bankruptcy?

A. No, no. We wouldn't change the status. Once something is paid or completed, that's the way it will stay until it's reported that way again. The only thing he changed was the court type. He changed it from federal court to bankruptcy court that's the only thing he changed.

Q. Okay. And would this have been Brian

Cawthorne that did this?

A. Yes.

Q. Now, the work that the team leader supervises, how is that selected?

A. It's just random. I mean, there's no --

Q. Is there any kind of formula or standard that Trans Union instructs the team leader to follow?

A. No.

Q. You just go in and take --

A. Uh-huh.

Q. Okay. Is there any record of these audits?

A. I don't know if they would still have them. At that time they would have the records and then cover it with the associate at the month end. They would have a meeting with them every month. Okay. This is where you stand. This is how you rate, you know, what your rating was.

Q. Are the minutes kept of those records?

A. No.

Q. They have performance ratings, that type of thing?
A. Right.
Q. Are those written or --
A. Well, yeah. The consumer -- the associate would get something and then the team leader would have something saying where they fell that month.
Q. All right. So in a situation such as this one if Brian Cawthorne was someone in his position makes a mistake if it's not one of the -- if the account is not one that the team leader is reviewing, it would be fair to say the mistake would go undetected?
A. Yes.
Q. So the only safeguard there on the operators and the people receiving this information is the random check and the diligence of the person, the operator?
MR. LUCKMAN: Object to the form.
MR. REDIHAN: All right. Let me rephrase it.
BY MR. REDIHAN:

Q. Are there any other quality control checks other than the team leader's review of an operator's work?

A. No.

Q. There's no computer cross-referencing of information that's received from vendors or subscribers in response to disputes?

A. No.

Q. Is that the way it is now?

A. Yes.

Q. Okay. How long has it been that way?

A. Since I've been there.

Q. Okay. We've seen trade set details, public record set details. Are there any other kind of set details?

A. No. You had the personal information, the address. I mean, each status set has -- you can go in and see that the personal information, the address information, wherever they're making a change, that's going to show up as a screen.

Q. Okay. Now, see on 14 where it says claims P3?

A. Yes.